

FILED
2022 Apr-19  AM 08:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **PROJECT SAY SOMETHING and** | ) | |
| **CAMILLE BENNETT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | |
| **RON TYLER, in his official capacity** | ) | |
| **as Florence Chief of Police, and** | ) | |
| **CITY OF FLORENCE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiffs, Project Say Something and Camille Bennett, by and through undersigned counsel, allege the following:

## INTRODUCTION

1.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, which establishes a private cause of action to redress the violation of constitutional rights under color of state law. The City of Florence ("the City") and its Chief of Police, Ron Tyler ("Tyler") (collectively, "Defendants") violated Plaintiffs' rights of freedom of speech and assembly, secured by the First Amendment to the U.S. Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment.

2.    The City's parade permit and noise ordinances are unconstitutionally vague as written. Additionally, Defendants have unconstitutionally applied the parade permit and noise ordinances to abridge, burden, and chill Plaintiffs' rights of speech and assembly, and to discriminate against them in public fora based on the content of their speech.

3.    Plaintiffs ask this Court to declare the City's parade and noise ordinances unconstitutional and to permanently enjoin their enforcement.

## JURISDICTION AND VENUE

4.    This action arises under the First and Fourteenth Amendments to the United States Constitution. Thus, the Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 (civil rights).

5.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). All parties reside in this district and all events giving rise to this claim occurred in this district.

## PARTIES

6.    Plaintiff, Project Say Something ("PSS"), is a 501(c)(3) nonprofit organization incorporated under the laws of Alabama. It is dedicated to confronting

racial injustice through communication, education, and community empowerment and carries out its mission through various lawful means, like organizing peaceful demonstrations on public sidewalks and common areas near the Lauderdale County Courthouse. In so doing, the organization exercises its rights of speech and assembly, protected by the First and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 4 and 25 of the Alabama Constitution. PSS is headquartered in Florence, Alabama in the Northern District of Alabama, Northwestern Division.

7.     Plaintiff, Camille Bennett, founded PSS in 2014. She engages in constitutionally protected speech and assembly, in her capacity as a citizen and as the founder and executive director of PSS, by organizing and participating in peaceful public demonstrations on matters of public concern. Bennett resides in the City of Florence which is located in Lauderdale County, Alabama. She is also the executive director of Focus Scope Child Enrichment Center, a day care center in Florence, Alabama.

8.     Defendant, the City of Florence, is a municipal corporation located within the Northwestern Division of the Northern District of Alabama. In disregarding Plaintiffs' constitutional rights, the City's agents acted pursuant to Florence's parade permit ordinance, Florence, Ala. Code ch. 17, and noise ordinance, id. ch. 15, under color of state law.

9.     Defendant Ron Tyler serves as the City's Chief of Police. He has served in this role at all times relevant to this complaint and has communicated with Plaintiffs regarding their protest activities. His actions complained of herein were carried out within the scope of his official duties as the Chief of Police and under color of state law. On information and belief, he resides in Florence, Alabama. He is sued in his official capacity.

## FACTS

### A.     The City's Noise and Parade Permit Ordinances

10.     The City's noise ordinance provides that "[i]t shall be unlawful for any person to make, continue, or cause to be made or continued any loud or excessive noise which unreasonably interferes with the comfort, health, or safety of others within the jurisdiction of the city."  Florence, Ala. Code § 15-26.

11.     The noise ordinance further provides that it is unlawful to "operate or play any radio, musical instrument, or similar device, whether from a motor vehicle or by a pedestrian, in such a manner as to be plainly audible to any person other than the player or operator of the device at a distance of five (5) feet in the case of a motor vehicle or ten (10) feet in the case of a pedestrian." § 15-27(a). The ordinance does not apply to the unamplified human voice.

12.     The noise ordinance further provides that it is "unlawful to operate or play any radio, television, phonograph, musical instrument, or similar device which produces or reproduces sound, whether from a business or a residence, in such a manner as to be plainly audible at a distance of fifty (50) feet to any person in a commercial, residential, multifamily dwelling, or public place." § 15-27(b). The ordinance does not apply to the unamplified human voice.

13.     The City's parade permit ordinance prohibits "parades" unless the Chief of Police—currently Tyler—grants a permit. Florence, Ala. Code § 17-21(a).

14.     The ordinance defines "parade" to mean "any parade, march, ceremony, show, exhibition, pageant, or procession of any kind, or any similar display, in or upon any street, park or other public place in the city." § 17-1. The ordinance clearly applies to assemblies that entail movement and that implicate traffic and safety concerns. See, e.g., §§ 17-21(b) (specifically exempting funeral processions and school functions from the permit requirement); 17-22(c)(5)–(11); 17-23(1)–(7).

15.     To obtain a permit, a parade organizer must pay a $10 fee and submit an application at least fifteen days before the planned parade to the police chief. The application must identify, inter alia, the organizer of the parade, its proposed date and duration, the parade route, and "[a]ny additional information which the Chief of Police shall find reasonably necessary to a fair determination as to whether a permit

should issue." § 17-22. Under the parade permit ordinance, Tyler has unlimited discretion to demand and consider "additional information" in deciding whether to issue a permit. § 17-22(c)(13). Tyler is also empowered to authorize a parade that uses a different route from the one named by the applicant. § 17-27.

16.    Plaintiffs have paid this $10 fee with their application at least two times.

17.    There are no ordinances in Florence that specifically apply to stationary demonstrations. Furthermore, the First Amendment prohibits all permits for stationary, peaceful demonstrations that take place in a traditional public forum like a sidewalk or public park. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51 (1969).

18.    For marches or parades taking place on sidewalks or in public streets, the First Amendment only permits content-neutral time, place, and manner restrictions aimed at preventing interference with the use of those sidewalks and streets. Cox v. New Hampshire, 312 U.S. 569, 575–76 (1941). The parade ordinance goes beyond these narrow restrictions, allowing Tyler to deny a permit for marches that are likely to "provoke disorderly conduct or create a disturbance." § 17-23(6).

19.    Moreover, the permit requirement applies to parades or marches of any size or even when participants obey traffic laws and do not impede others from using sidewalks. For example, a group of three people are subject to the parade permit

requirement if they are marching down the City's streets in a way that Tyler interprets as falling within the permit requirement.

**B.      Plaintiffs Have Engaged in Peaceful Protests since June 2020**

20.    Since at least June 2020, Plaintiffs have engaged in peaceful demonstrations and other political activity protesting a Confederate monument located in front of the Lauderdale County Courthouse. These protests are part of the national discourse about the placement of Confederate monuments.

21.    In 2020, following the murder of George Floyd, PSS demonstrated approximately five days a week, ultimately protesting approximately 160 to 175 times before the end of the year.

22.    Plaintiffs organized their protests to maximize their potential audience. PSS conducted many of its protests on the public sidewalks in front of or near the Lauderdale County courthouse. It also conducted peaceful protests in parks and on public sidewalks in Florence's downtown restaurant and business district. Permits are not required for peaceful protests located in a traditional public forum such as a sidewalk or public park. Exhibit 1.

23.    In 2021, PSS organized fewer protests because the City and its police department used the City's parade permit and noise ordinances to discourage

Plaintiffs from exercising their First Amendment rights.

24.    Specifically, Tyler used his discretion under the parade permit ordinance to relocate Plaintiffs away from their intended audience on Court Street to a "protest zone" at the intersection of Court Street and Tennessee Street. From the "protest zone"—over one block away from Plaintiffs' desired protest location—Plaintiffs could not be seen by their intended audience and risked violating the noise ordinance if they wanted to be heard from that distance.

25.    Additionally, Tyler leveraged his discretion under the noise ordinance to threaten that he would issue citations to Plaintiffs. The City's law enforcement officers have given inconsistent guidance to Plaintiffs on how they can comply with the ordinances, forcing them to conduct silent protests for fear of breaking the law.

26.    Plaintiffs' protests have  been consistently non-violent, have never obstructed pedestrian or vehicle traffic, and have never prevented ingress or egress to any public or privately owned building.

27.    On information and belief, the City failed to train its law enforcement officers on the established right of citizens to speak and assemble in peaceful public demonstrations, and to do so without unlawful interference from parade and noise ordinances. This failure to train evinced deliberate indifference to Plaintiffs' constitutionally cognizable rights and interests.

C.    **The City Used the Parade Permit Ordinance to Burden
      and Chill Plaintiffs' Exercise of their First Amendment
      Rights**

28.    As alleged in paragraphs 14–19, the City's parade permit ordinance does
not explicitly apply to stationary demonstrations, including stationary protests held
in traditional public fora where no permit is required. Nevertheless, the City's law
enforcement officers have used the ordinance to burden Plaintiffs' exercise of their
First Amendment rights by diverting them from their intended audience, exposing
them to unjustified costs and risk, and discriminating against them in a public forum
based on the content of their speech.

29.    On July 26, 2020, Tyler wrote in an email to Bennett, that "[t]he police
department has been very lenient with [PSS's] past events in downtown that have no
permit." Exhibit 2. The email conveyed a veiled threat to Plaintiffs that the police
department would be less lenient about unpermitted events in the future. But Tyler
cannot claim to have been lenient when the City's ordinance does not and could not
apply to Plaintiffs' expressive and protected demonstrations.

30.    On July 27, 2020, Tyler leveraged his discretion to issue permits to
divert Plaintiffs from protesting near their intended audience, writing: "[I]f you apply
for a permit [on a particular] block during the busiest hour of restaurant traffic, on
two of the busiest days, I would not be inclined to approve it, but would request you

consider [another] block . . . , where there are fewer restaurants." Exhibit 2. The Plaintiffs were redirected to a designated "protest zone" at the intersection of Court Street and Tennessee Street located over one block from their preferred location in front of the Lauderdale County Courthouse on Court Street.

31.    In 2020, PSS requested to block off a street for protests. The City conditioned supplying police for blocking the street on payment of a $360 police protection fee per day. PSS was unable to pay this daily sum and the request for permits was denied.

32.    The City's parade permit ordinance requires a $10 application fee but does not authorize police protection fees. See § 17-22(e).

33.    On July 27, 2020, Tyler emailed Plaintiffs, assessing a $360 fee per day for police protection for permits to demonstrate. He did not explain how he calculated the fee; nor did he provide the ordinance authorizing the fee. Exhibit 2.

34.    That same day, Bennett sought a fee waiver from Tyler via email because PSS is a 501(c)(3) organization with limited funds. He did not respond to the waiver request. Exhibit 2.

35.    In lieu of paying the unsubstantiated fee, PSS began hiring private security in November 2020 for approximately $600 per month, at an approximate total cost of $4,100 to date.

36.    Plaintiffs have hired private security to bear the costs of protecting themselves against counter-protesters?a job that is properly handled by the police department?so that they can safely and peacefully exercise their constitutional rights.

### D.    The City Used the Noise Ordinance to Burden and Chill Plaintiffs' Exercise of their First Amendment Rights

37.    As alleged in paragraphs 10–12, the City's noise ordinance prohibits any "loud or excessive noise which unreasonably interferes with the comfort, health, or safety of others within the jurisdiction of the city." Florence, Ala. Code § 15-26. The ordinance does not explicitly apply to the unamplified human voice. The City's law enforcement officers have applied those ordinances in inconsistent, arbitrary, and discriminatory ways to burden and chill Plaintiffs' speech, at PSS demonstrations near the courthouse and in the downtown business district.

38.    During the week of July 27, 2020, Bennett asked Tyler via email for clarification about whether they could play music during their protest. Tyler responded, as did another police officer, suggesting that music at the courthouse was acceptable. Relying on that instruction, Plaintiffs played music at the courthouse "through the same sound system for 8 weeks." See Exhibits 2 and 3.

39.    Subsequently, counter-protesters gathered at the courthouse and screamed racial epithets at PSS's Black protesters, causing tensions to rise.

40.    Tyler  allowed  PSS  to  play  music to defuse tensions with counter-protesters. However, other police officers have told PSS that playing music violates the noise ordinance. See Exhibit 3.

41.    PSS has consistently tried to respect law enforcement's contradictory instructions and advice despite the burden it placed on their protected rights.

42.    To  placate  law  enforcement,  Plaintiffs have foregone sound amplification devices and even the human voice, conducting silent protests in the Florence business district, including on Court Street. Specifically, Plaintiffs opted to conduct at least ten silent protests during the summer of 2020 after receiving insufficient notice about the need to protest within a restricted "protest zone" just hours before a scheduled protest. Upon receiving such notice, Plaintiffs consulted with attorneys who confirmed that silent protests in their desired location on Court Street would not violate existing ordinances. The decision to protest silently stemmed from fear of retribution, including arrest, from Florence police officers if they vocally protested in their intended location.

43.    On September 11, 2020, Tyler emailed Plaintiffs, refusing to define the word "reasonable" in the noise ordinance. He wrote that the Plaintiffs could "[a]rgue with the judge during court if you must regarding what you think is 'reasonable.' We won't argue the point tonight." Exhibit 4.

44.    On June 4, 2021, Plaintiffs gathered in their designated "protest zone" at the intersection of Court Street and Tennessee Street, where they had previously protested and chanted. An onlooker complained to a police officer. That police officer then approached the protesters. A protester with PSS asked the officer for guidance as to when noise "unreasonably interferes." The officer replied, "when . . . I've got people walking up to me and complaining. That's unreasonable noise." Minutes later, in the same conversation, that officer switched the rule: "[Just] don't go blue in the face screaming." See https://perma.cc/U6UZ-T8T5 at 11:35 and 17:55.

### E.    City Police Have Tolerated Threatening and Noisy Behavior by Counter-Protesters

45.    Despite the non-violent nature of Plaintiffs' protesting, counter-protesters have engaged in aggressive, threatening, and noisy behavior. The City has tolerated such behavior from counter-protesters and failed to respond to reports of threats made against Plaintiffs. The ordinances' vagueness enables both arbitrary and viewpoint discriminatory enforcement.

46.    Counter-protesters started showing up when PSS began protesting in 2020. Between fifteen to fifty counter-protesters have shown up at PSS's protests.

47.    Counter-protesters have sometimes been hostile and aggressive. For instance, one counter-protester threatened protesters by yelling "I will fuckin' mace

your ass!" This same man deliberately harassed Bennett during protests and online. Exhibit 5.

48.     Another counter-protester slapped a PSS protester, who was recording the counter-protest. PSS notified a deputy sheriff who was present for the incident.

49.     On September 20, 2020, Bennett notified Tyler that a counter-protester tried to run over her and two children with a car. Exhibit 6.

50.     On September 20, 2020, Bennett notified Tyler about a social media post in which a counter-protester discussed a plan "to shut down [Bennett's] daycare center." Exhibit 6. Counter-protesters have staked out Bennett's daycare center and spoken with parents to discourage them from sending their children to the daycare in an effort to interfere with the daycare's operations.

51.     Bennett has received multiple death threats and notified the police about them. See Exhibits 7, 8, 9, and 10.

52.     Counter-protesters have also taken to social media to intimidate, threaten, and "dox"[1] PSS protesters and supporters. One Florence citizen created a Facebook group where citizens posted threatening messages. For instance, one

_____

[1]
        To "dox" is to publish private information about someone as a form of punishment. Dox, Merriam Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/dox.

counter-protester posted, "Guess bullets [are] only option left on the table it seems." See Exhibit 11 (documenting screenshots of threatening messages on Facebook directed at PSS). When Bennett showed documentation of these threats to police, her concerns were brushed off because the threats took place online.

53.     Another posted, "Execute everyone there! Put an end to this hate for America! Execute them all so we don't have to put up with their crap again later. Execute all that support them. All businesses and owners. If they don't LOVE AMERICA EXECUTE THEM NOW!!" Exhibit 12.

54.     Bennett has notified the police about the repeated verbal and physical threats from counter-protesters. On information and belief, the City's police have not filed any police reports, investigated, or cited anyone for unlawful intimidation, stalking, terrorist threats or harassing communications, as is warranted by state law. Ala. Code § 13A-11-8.

55.     On information and belief, counter-protesters have not been subjected to warnings, fines, or enforcement action under the city's parade or noise ordinances. Instead, counter-protesters' discomfort and disagreement with Plaintiffs' speech has formed the basis for Defendants' enforcement of the noise ordinance against Plaintiffs. Such viewpoint discrimination is plainly unconstitutional.

**F.     Outreach to the City of Florence**

56.     From 2017 through the present, Plaintiffs have sought to engage the City in productive dialogue to clarify the City's ordinances without resorting to the courts.

57.     Bennett and other members of PSS have appeared before the City Council at least eight times to voice their concerns about the location of the confederate monument.

58.     Plaintiffs have repeatedly sought clarification of the ordinances regulating their protest activities from Tyler and have notified police of the threatening behavior of counter-protesters. See, e.g., Exhibits 2, 13, and 14.

59.     Through counsel, Plaintiffs have submitted public comments to the Florence City Council to voice their concerns regarding the Confederate monument and the City's unclear and inconsistently applied rules governing protest activities.

60.     On September 7, 2021, Plaintiffs sent a letter to the City Council and Mayor, detailing their constitutional concerns with the City's ordinances. The City Council did not acknowledge receipt and some councilors claimed to have never received the letter.

61.     On November 2, 2021, Plaintiffs and their counsel appeared before the City Council, with the mayor in attendance, to voice their objections to the City's unconstitutional ordinances as expressed in their letter of September 7, 2021. In

closing remarks at the Council meeting, councilors thanked Plaintiffs for attending and expressed their intent to address the issues raised.

62.    No city representative has yet responded to Plaintiffs' constitutional concerns.

## CAUSES OF ACTION

### A.    Count I: Violation of the Rights of Speech and Assembly Protected by the U.S. and Alabama Constitutions

63.    Plaintiffs adopt and incorporate by reference all of the allegations contained in paragraphs 1 through 64 hereof, inclusive.

64.    The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983 and incorporated by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech … or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

65.    Article 1 section 4 of the Alabama Constitution provides that "no law shall ever be passed to curtail or restrain the liberty of speech . . . and any person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Ala. Const. art. 1, § 4.

66.    Article 1 section 25 of the Alabama Constitution provides that "citizens

have a right, in a peaceable manner, to assemble together for the common good, and to apply to those invested with the power of government for redress of grievances or other purposes, by petition, address, or remonstrance." Ala. Const. art. 1, § 25.

67.    Through the prohibitions in the City's parade permit and noise ordinances, Defendants have deprived Plaintiffs of their right to engage in protected speech and assembly, in violation of the speech and assembly clauses of the First Amendment to the U.S. Constitution and article 1 sections 4 and 5 of the Alabama Constitution.

68.    The prohibitions in the City's parade permit and noise ordinances, Florence, Ala. Code, chs. 15 and 17, facially and as applied to Plaintiffs, impermissibly regulate and restrict the time, place, and manner of protected speech and assembly in a public form.

69.    The prohibitions in the City's parade permit ordinance, parade permit and noise ordinances, Florence, Ala. Code, chs. 15 and 17, facially and as applied to Plaintiffs, create an unreasonable and disproportionate burden on the exercise of Plaintiffs' speech and assembly rights without any legitimate justification.

70.    All persons within the city limits of Florence are subject to the prohibitions of the City's parade permit and noise ordinances, Florence, Ala. Code, chs. 15 and 17, and there are no available and ample alternative channels for peaceful

assembly and communication of protected speech.

71. The prohibitions in the City's parade permit ordinance, Florence, Ala. Code, ch. 17, facially and as applied to Plaintiffs, violate the First Amendment by granting the Chief of Police unbridled discretion such that the chief's decisions to limit speech and assembly are not constrained by objective criteria, but may rest on discretionary, ambiguous, and subjective grounds.

72. The prohibitions in the City's noise ordinance, Florence, Ala. Code, ch. 15, facially and as applied to Plaintiffs, violate the First Amendment by failing to provide an objective guide for distinguishing between permissible and impermissible noise levels in a non-arbitrary and viewpoint-neutral manner that can be consistently enforced.

73. As a direct and proximate result of Defendants' violation of the speech and assembly clauses of the First Amendment to the U.S. Constitution and Article 1 sections 4 and 25 of the Alabama Constitution, Plaintiffs have suffered and will suffer irreparable harm, including the deprivation of constitutional rights.

74. Accordingly, chapters 15 and 17 of the Florence Code cannot withstand scrutiny under the First Amendment, and Plaintiffs are entitled to declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

**B.      Count II: The Noise Ordinance is Void for Vagueness**

75.      Plaintiffs adopt and incorporate by reference all of the allegations contained in paragraphs 1 through 29 and paragraphs 39 through 64 hereof, inclusive.

76.      The Fourteenth Amendment to the United States Constitution, enforceable through 42 U.S.C. § 1983, provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Laws that fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" violate this requirement of due process, and are void for vagueness. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). A law that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis" is likewise void for vagueness in light of "the attendant dangers of arbitrary and discriminatory application" that such sweeping delegation entails. Id. at 108–09.

77.      The City's noise ordinance, Florence, Ala. Code, ch. 15, violates the Due Process Clause of the Fourteenth Amendment, facially and as applied to Plaintiffs, because it fails to provide a meaningful description of the level of noise that its terms proscribe. The City's noise ordinance relies on indeterminate terms like "unreasonably interferes," § 15-26, and "plainly audible," § 15-27(a)–(b). None of its limitations clearly apply to the unamplified human voice. The noise ordinance

provides no meaningful guidance to law enforcement, courts, or the general public on how to interpret or apply its provisions. The behavior of the Florence police has further muddled these terms and expanded the scope of the ordinance.

78.    City law enforcement officers have failed to define and enforce a clear or consistent meaning to the broad terms of the noise ordinance, such as what level of noise is "plainly audible" and what noise "unreasonably" interferes with the "comfort, health, or safety" of the people of Florence.

79.    Because the ordinance fails to define which sound "unreasonably interferes," and because the ordinance fails to clarify when it prohibits playing music, neither PSS nor law enforcement knows the decibel level that the ordinance forbids, leaving protesters at the mercy of the whims of law enforcement. Tyler directed PSS to risk criminal prosecution to ascertain the law's bounds, writing "[a]rgue with the judge during court if you must regarding what you think is 'reasonable.'" Exhibit 4. The noise ordinance thus "impermissibly delegates" the basic policy of acceptable noise levels to the municipal police and judges, for resolution on an ad hoc and subjective basis.

80.    City law enforcement officers have provided PSS with conflicting instructions regarding when protesters can play music or utilize sound amplification devices. See Exhibits 3 and 4. Accordingly, the legality of playing music and

amplifying sound rests on the whim of law enforcement, not a clear ordinance. The lack of clarity in the noise ordinance multiplies the risk of arbitrary and discriminatory enforcement.

81.    Further, the ordinance says nothing about the unamplified human voice. The lack of clarity in the ordinance gives law enforcement the discretion to expand the scope of the noise prohibition. Defendants have threatened Plaintiffs with citations for engaging in unamplified speech and effectively forced PSS to conduct silent protests rather than risk criminal prosecution.

82.    The unclear and indeterminate noise ordinance deters citizens from exercising their constitutionally protected protest rights by failing to put them on notice of what conduct falls within the ordinance's bounds. This unpredictability has chilled Plaintiffs' speech, causing them to protest less frequently. At times, Plaintiffs have protested silently, literally abridging their speech. The City's noise ordinance has thus silenced Plaintiffs in violation of their constitutional rights.

83.    Because the City's noise ordinance fails to provide reasonable notice of what conduct is proscribed and to establish concrete guidelines to govern law enforcement's exercise of discretion in implementation and enforcement, the provisions violate the Due Process Clause of the Fourteenth Amendment and are therefore void.

84. As a direct and proximate cause of the discretionary enforcement of the noise ordinance, Plaintiffs have suffered and will continue to suffer irreparable damage.

85. Accordingly, Plaintiffs are entitled to injunctive and declaratory relief under 42 U.S.C. § 1983.

**C.    Count III: The Parade Permit Ordinance is Void for Vagueness**

86. Plaintiffs adopt and incorporate by reference all of the allegations contained in paragraphs 1 through 38 and paragraphs 47 through 64 hereof, inclusive.

87. The Fourteenth Amendment to the United States Constitution, enforceable through 42 U.S.C. § 1983, provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Laws that fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" violate this requirement of due process, and are void for vagueness. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). A law that "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis" is likewise void for vagueness in light of "the attendant dangers of arbitrary and discriminatory application" that such sweeping delegation entails. Id. at 108–09.

88. The City's parade permit ordinance, Florence, Ala. Code, ch. 17, violates

the Due Process Clause of the Fourteenth Amendment, facially and as applied to Plaintiffs, because it allocates unlimited discretion to the Chief of Police to demand and consider "additional information" from permit applicants in deciding whether to issue a permit. §17-22(c)(13). It also gives the chief discretion to require a parade to take place on a different date, time, or route than the one requested by the applicant even when the parade does not violate traffic laws and when passersby can easily access and use sidewalks when no permit at all is required. §17-27. The ordinance thus "impermissibly delegates" the basic policy decision of who will be issued a parade permit to the police chief, for resolution on an ad hoc and subjective basis.

89.    Tyler has exercised his discretion to burden Plaintiffs' speech and assembly rights in numerous ways, including by threatening to enforce the ordinance against Plaintiffs' stationary protests; by forcing Plaintiffs to assemble in a "protest zone" that is distant from their intended audience; and by levying a police security fee not authorized by the ordinance. The lack of clear and meaningful limitations on the discretion of the Chief of Police in the ordinance has led to its arbitrary and discriminatory enforcement against Plaintiffs.

90.    The City's parade permit ordinance fails to provide reasonable notice of whether it applies to stationary protests or to marches on sidewalks when participants adhere to traffic laws and do not block others from using streets or sidewalks. The

ordinance therefore fails to establish concrete guidelines to govern the Chief of Police's exercise of discretion in issuing permits, the provisions violate the Due Process Clause of the Fourteenth Amendment and are therefore void.

91.    As a direct and proximate cause of the discretionary enforcement of the parade permit ordinance, Plaintiffs have suffered and will continue to suffer irreparable damage.

92.    Accordingly, Plaintiffs are entitled to injunctive and declaratory relief under 42 U.S.C. § 1983.

**D.    Count IV: Violation of the Equal Protection Clause**

93.    Plaintiffs adopt and incorporate by reference all of the allegations contained in paragraphs 1 through 64 hereof, inclusive.

94.    The Fourteenth Amendment to the United States Constitution, enforceable through 42 U.S.C. § 1983, provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

95.    The threatened enforcement of the City's parade permit and noise control ordinances against Plaintiffs violates the equal protection guarantee of the Fourteenth Amendment by treating Plaintiffs differently from others similarly interested, and therefore similarly situated, in expressing views on the statute's placement.

Defendants have burdened and chilled the Plaintiffs' demonstrations, whereas they have not engaged in similar chilling activity with counter-protesters. This disparate treatment is especially concerning, given that counter-protesters have at times behaved aggressively, violently, and noisily at Plaintiffs' assemblies yet were not subjected to similar warnings, threats, and limitations by Defendants.

96.     Defendants' treatment of Plaintiffs was and is unreasonable, discriminatory, arbitrary, and capricious, and not reasonably related to any legitimate state interest or to the public health, safety, morals, or general welfare.

97.     As a direct and proximate cause of the unjustified behavior of Defendants, Plaintiffs have suffered and will continue to suffer irreparable damage.

98.     Accordingly, Plaintiffs are entitled to injunctive and declaratory relief under 42 U.S.C. § 1983.

**E.      Count V: The Ordinances are Unconstitutionally Overbroad**

99.     Plaintiffs adopt and incorporate by reference all of the allegations contained in paragraphs 1 through 64 hereof, inclusive.

100.   A law is substantially overbroad, and unconstitutional, if it suppresses substantially more speech than necessary to achieve its goal, or if it burdens speech that may not be burdened under the First and Fourteenth Amendments. Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 796

(1984); Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

101.   The City's parade permit and noise ordinances, facially and as applied to Plaintiffs, impermissibly sweep within their prohibitions speech that is protected by the First Amendment.

102.   The City's parade permit ordinance is so broadly written that it has been applied to restrict Plaintiffs' peaceful demonstrations in public fora. The First Amendment prohibits all permits for stationary, peaceful demonstrations that take place in a traditional public forum like a sidewalk or a public park, and permits for mobile demonstrations that do not obstruct traffic. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51 (1969). The parade permit ordinance thus suppresses substantially more speech than is necessary to achieve its goal of maintaining the orderly and safe flow of traffic.

103.   The City's noise ordinance is so broadly written that it has been applied to the use of the unamplified human voice in Plaintiffs' demonstrations. Under threat of enforcement, Plaintiffs have opted to conduct silent protests, quite literally silencing their protected speech. The noise ordinance thus suppresses substantially more speech than is necessary to achieve its goal of protecting the comfort, health, and safety of people within the City's jurisdiction.

104.   The City's ordinances amount to blanket restrictions on protected speech

-27-

and assembly rights, are substantially overbroad, and therefore unconstitutional.

105.   As a direct and proximate cause of the enforcement of the City's parade and noise ordinances, Plaintiffs have suffered and will continue to suffer irreparable damage.

106.   Accordingly, Plaintiffs are entitled to injunctive and declaratory relief under 42 U.S.C. § 1983.

## INJUNCTIVE RELIEF

107.   As long as the City's parade permit and noise ordinances remain in effect, Plaintiffs will suffer irreparable injury. The ordinances, as written and as applied, violate Plaintiffs' First Amendment rights and thus constitute irreparable harm. To date, Plaintiffs' permit requests have been conditioned on payment of unexplained police protection fees. When they did not pay these per diem fees because they were unaffordable, the permits were denied. Plaintiffs have instead felt compelled to hire their own private security firm to protect against counter-protesters. Their protests have been relegated to less populated areas of town, despite no cited safety concerns. Plaintiffs have also been left to guess as to what constitutes a "reasonable" level of noise under the threat of being cited and haled into court for violating the noise ordinance. As a result, they have been silenced. Plaintiffs intend

to protest in Florence in the future and will suffer irreparable injury if the parade permit and noise ordinances remain in force.

108.    Absent injunctive relief, Plaintiffs' First Amendment rights will continue to be violated.

109.    The public interest demands that all citizens, including Plaintiffs, be able to exercise their First Amendment rights to the full extent guaranteed under the Constitution.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court:

1.    Declare that the City's parade permit and noise ordinances are facially vague in violation of the First and Fourteenth Amendments to the U.S. Constitution, or, alternatively, declare these ordinances unconstitutional as applied to Plaintiffs;

2.    Enjoin the Defendants from enforcing the City's parade permit and noise ordinances against Plaintiffs in their upcoming protests;

3.    Award Plaintiffs costs, including reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988(b); and

4.      Grant Plaintiffs any additional relief as may be just and proper.

_/s/ LaTisha Gotell Faulks_

LaTisha Gotell Faulks (ASB-1279-I63J)
ACLU of Alabama Foundation
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org

_/s/ David Gespass_

David Gespass
GESPASS & JOHNSON
National Lawyers Guild-Alabama Chapter
40 Echo Lane
Fairhope, AL 36532
205-566-2530
pass.gandjlaw@gmail.com

Attorneys for Plaintiffs

Attorneys for Plaintiffs would also like to acknowledge and thank the Duke Law First Amendment Clinic and, particularly, students and former students, Yoo Jung Hah, Andrew Webb, Jonathan Ellison, Sadie Kavalier, Shannon O'Hara, and Jenny Wheeler for their invaluable pro bono assistance preparing this case. They will be credits to the profession.